IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 09-cv-01628-MSK

FRED RAYNEL LUCERO,

      Petitioner,

vs.

KEVIN MILYARD, Warden, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

      Respondents.

---

**OPINION ON PETITION FOR A WRIT OF HABEAS CORPUS PURSUANT TO
28 U.S.C. § 2254**

---

This matter comes before the Court pursuant to Mr. Lucero's (Petitioner's) Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (# 2).[1]  Respondents filed an Answer (# 18). Petitioner filed a Traverse (# 21).  Having considered the same, along with pertinent portions of the state court trial record (# 23), the Court

    **FINDS** and **CONCLUDES** that:

### I.  Jurisdiction

The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. §§ 2254 and 1331.

---

[1]Because Petitioner appears pro se, the Court construes his filings liberally.  *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).  However, the Court does not serve as his advocate.  *See Hall v. Bellman*, 935 F.2d 1106, 1110 (10th Cir. 1991).

## II. Background[2]

On April 18, 1995, Petitioner was charged with two counts of first degree murder, two counts of crime of violence, and one count of unlawful retaliation against a witness or a victim. The two victims, a woman and a man, were found stabbed to death in the man's apartment. The month before the homicides, the female victim had been hospitalized for numerous injuries, which she claimed had been inflicted by Petitioner, her boyfriend at the time. While in the hospital, she told the police officers that Petitioner had beaten her and held her against her will for eight days before she was able to escape. She also told police officers about her fear of Petitioner and that he had stated he would kill her if she told the police. Thereafter, Petitioner was charged with one count of second degree assault, one count of third degree assault, false imprisonment, and a crime of violence.

The day after the victims were found, a narcotics detective, who had been using Petitioner as an informant, met with Petitioner in an attempt to elicit information about the homicides. The following day, that detective, together with two other detectives, asked Petitioner to come to the police department to discuss the homicides. After interviewing Petitioner, the detectives executed a Colo. R. Crim. P. 41.1 order for nontestimonial evidence.

Before trial, Petitioner filed a motion to suppress the statements he made during both interviews and argued that such statements had been involuntary and obtained in violation of the Rule 41.1 order. He also filed a motion to suppress his statements made after the execution of that order. The prosecution filed a pretrial motion of intention to offer residual hearsay evidence

---

[2]  The background is taken from the statement of the case in Petitioner's opening brief on direct appeal and the Colorado Court of Appeals' (CCA's) opinion. *People v. Lucero*, No. 96CA2264 at 2-3 (Colo. App. Aug. 12, 1999) (unpublished); Pre-Answer Resp. App. C (# 10-3) at 8-9. For ease of reference, the page numbers referred to in citations to documents filed in this case are the page numbers identified by the Court's Electronic Court Filing system.

pursuant to Colo. R. Evid. 804(b)(5).  Specifically, the prosecutor sought to admit the statements the female victim had made to the police officers regarding Petitioner.

Following a hearing, the trial court refused Petitioner's request to suppress his statements made during the two interviews, finding that he was not in custody and that he had made the statements voluntarily.  The court, however, did suppress all statements made by Petitioner after the police had served the Rule 41.1 order.  The court also found the statements made by the female victim were admissible.  The two officers then were allowed to testify at trial that the female victim had stated Petitioner threatened to kill her and she was afraid of him.

On October 18, 1996, the jury convicted Petitioner of two counts of first degree murder and one count of retaliation against a witness or victim.  The trial court subsequently sentenced Petitioner to two consecutive life sentences and to a twenty-year sentence on the retaliation count to run concurrently with his murder conviction involving the female victim.  On August 12, 1999, the CCA affirmed Petitioner's convictions, *see Lucero*, No. 96CA2264, and on May 15, 2000, the Colorado Supreme Court denied certiorari review, Pre-Answer Resp. at App. H (# 10-8).

On  April 5, 2001, Petitioner filed a motion for postconviction relief pursuant to Colo. R. Crim. P. 35(c).  Pre-Answer Resp. App. A (Doc. # 10-1) at 28.  Subsequently, appointed counsel filed a supplemental Rule 35(c) motion on September 29, 2005.  App. A at 34.  The trial court issued a written order on August 22, 2006, denying the Rule 35(c) motion, App. A at 36, and on February 19, 2009, the CCA affirmed the trial court's denial, *see People v. Lucero*, No. 06CA2043 (Colo. App. Feb. 19, 2009) (unpublished).  On June 8, 2009, the Colorado Supreme Court denied certiorari review.  Pre-Answer Resp. App. M (# 10-13).

3

Petitioner commenced this action on June 30, 2009, and asserted eight claims as follows: (1) trial court error in admitting his involuntary statements; (2) trial court error in admitting the female victim's statements; (3) a due process violation by the trial court in refusing to admit a witness's failed polygraph test; (4) a tainted jury due to the trial court's comments during voir dire; (5) ineffective assistance of counsel in failing to ask for a new jury venire following the trial court's comments; (6) prosecutorial misconduct; (7) ineffective assistance of counsel for not presenting exculpatory evidence; and (8) improper evaluation of newly discovered evidence in the postconviction proceeding, including trial counsel's lack of diligence in pursing a recanted testimony and the proper stature of a witness's brother.

Upon concluding a preliminary review of the Petition based on affirmative defense arguments set forth by Respondents, Judge Weinshienk determined Claims Four, Six, and part of Claim Eight were procedurally defaulted.  Judge Weinshienk, therefore, dismissed these claims as barred from federal habeas review.  Remaining before the Court for a review of the merits then were Claims One, Two, Three, Five, Seven, and a construed ineffective assistance of counsel issue in Claim Eight.  Petitioner filed a Motion to Object challenging Judge Weinshienk's dismissal of Claims Four, Six, and part of Eight.  The Court through adoption of the magistrate judge's Report and Recommendation found no legal incorrectness in Judge Weinshienk's Order dismissing Claims Four, Six, and part of Eight.  The Court now will proceed to review the merits of the remaining claims.

Respondents concede the remaining claims are timely.  They, however, do not waive an exhaustion defense with respect to these claims.

### III.  Legal Standard

In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does not sit as a super-state appellate court. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). "When a federal district court reviews a state prisoner's habeas petition pursuant to 28 U.S.C. § 2254 . . . [it] does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*." *Coleman v. Thompson*, 501 U.S. 722, 730 (1991) (internal quotations and citations omitted).

Because the Petition was filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), it is governed by those provisions. *Cannon v. Mullin*, 383 F.3d 1152, 1158 (10th Cir. 2004) (citing *Rogers v. Gibson*, 173 F.3d 1278, 1282 n. 1 (10th Cir. 1999)). Under the AEDPA, a district court may only consider a habeas petition when the petitioner argues that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be issued with respect to any claim that was adjudicated on the merits in state court, unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Claims of legal error and mixed questions of law and fact are reviewed pursuant to 28 U.S.C. § 2254(d)(1). *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003). The threshold question pursuant to § 2254(d)(1) is whether Petitioner seeks to apply a rule of law that was

clearly established by the Supreme Court at the time his conviction became final. *See Williams v. Taylor*, 529 U.S. 362, 390 (2000). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. Furthermore,

> clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case sub judice. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).

If there is no clearly established federal law, that is the end of the Court's inquiry pursuant to § 2254(d)(1). *See id.* at 1018. If a clearly established rule of federal law is implicated, the Court must determine whether the state court's decision was contrary to or an unreasonable application of that clearly established rule of federal law. *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent." *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [ (10th Cir. 2006) ] (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405). "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.' " *Williams*, 529 U.S. at 405 (citation omitted).

> A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts. *Id.* at 407-08. Additionally, we have recognized that an unreasonable application may occur if the state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply.

*House,* 527 F.3d at 1018.

The Court's inquiry pursuant to the "unreasonable application" clause is an objective one. *See Williams*, 529 U.S. at 409-10. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather that application must also be unreasonable." *Id*. at 411. "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671.

In addition,

> evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.  It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Harrington v. Richter*, 131 S. Ct. 770, 786,  --- U.S. --- (Jan. 19, 2011) (internal quotation marks and citation omitted).  The Court "must determine what arguments or theories supported or . . . could have supported[ ] the state court's decision" and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id*.  "Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citation omitted).  "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* (citation omitted).

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671.  Furthermore,

> [a]s a condition for obtaining habeas corpus relief from a federal
> court, a state prisoner must show that the state court's ruling on the
> claim being presented in federal court was so lacking in
> justification that there was an error well understood and
> comprehended in existing law beyond any possibility for
> fairminded disagreement.

*Richter*, 131 S. Ct. at 786-87.

Claims of factual error are reviewed pursuant to 28 U.S.C. § 2254(d)(2).  *See Romano v. Gibson*, 278 F.3d 1145, 1154 n. 4 (10th Cir. 2002).  Section 2254(d)(2) allows a court to grant a writ of habeas corpus only if the state court decision was based on an unreasonable determination of the facts in light of the evidence presented.  Pursuant to § 2254(e)(1), the Court must presume that the state court's factual determinations are correct and Petitioner bears the burden of rebutting the presumption by clear and convincing evidence.  "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.' " *Miller-El  v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

A claim, however, may be adjudicated on the merits in state court even in the absence of a statement of reasons by the state court for rejecting the claim.  *Richter*, 131 S. Ct. at 784. ("[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning").  Furthermore, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 784-85.  Even "[w]here a state court's decision is unaccompanied by an explanation, the

habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id*. at 784.

In other words, the Court "owe[s] deference to the state court's result, even if its reasoning is not expressly stated." *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999). Therefore, the Court "must uphold the state court's summary decision unless [the court's] independent review of the record and pertinent federal law persuades [it] that [the] result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Id*. at 1178. "[T]his 'independent review' should be distinguished from a full de novo review of the petitioner's claims." *Id*. Likewise, the Court applies the AEDPA deferential standard of review when a state court adjudicates a federal issue relying solely on a state standard that is at least as favorable to the petitioner as the federal standard. *See Harris v. Poppell*, 411 F.3d 1189, 1196 (10th Cir. 2005). If a claim was not adjudicated on the merits in state court, and if the claim also is not procedurally barred, the Court must review the claim *de novo* and the deferential standards of § 2254(d) do not apply. *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004).

## IV.  Analysis

### 1.  Claim One

In his first claim, Petitioner asserts that the involuntary statements he made to the Grand Junction police officers on March 27 and 28, 1995, were the results of promises and representations, which had been made to him by law enforcement officers, and should have been suppressed under Art. II, §§ 7, 10, and 25 of the Colorado Constitution and the Fourteenth Amendment. Petitioner further claims that because the statements were obtained in violation of Colo. R. Crim. P. 41.1 his Fourteenth Amendment rights were violated.

In his Traverse, Petitioner argues that the Grand Junction police officers used him as a paid informant immediately prior to the challenged interrogations to provide information about the murder of one of the victims and led him to believe that any statement he made would be made only in his role as an informant and not as a suspect in the homicide.  Traverse at 8. Petitioner concludes that this fact should be considered as part of the totality of the circumstances analysis and not disregarded as was done by the trial court and the CCA. Traverse at 8.

Petitioner further argues that prior to his second interview a vast number of law enforcement officers with weapons, and in vehicles, surrounded his home to take him to the police station for several hours of interrogation by numerous officers, suggesting that he was not free to leave.  Traverse at 9.  Petitioner also contends that at first he was questioned without a *Miranda* warning, and as a result all of the questioning should be suppressed.  Traverse at 10. With respect to the Rule 41.1 order for nontestimonial evidence, Petitioner argues the order was used to obtain information from him after the interrogation in an effort to circumvent the prohibitions against obtaining statements during a nontestimonial identification procedure. Traverse at 11.

The trial court dealt with the suppression of Petitioner's statements as follows:

> First of all, motion number 40, which seeks to suppress Mr. Lucero's statements to Detective Norcross on 3/27/95 as contained in Exhibit 2, the motion admits that this was noncustodial--and it certainly was--but claims that the defendant knew that Detective Norcross could address- -could arrest him, which may be true, but is certainly irrelevant.

> It also alleges that Detective Norcross knew, or should have known, that the defendant was already represented by counsel.  That's also true, but for our purposes irrelevant, because the evidence indicates that the defendant was represented by counsel, but in another case.

In fact, the charges in this case had not been filed yet, and so Mr. Lucero's Sixth Amendment right in this case had not yet attached.  As the Colorado Supreme Court held in *People* [*v.*] *Son*, which counsel cited ti me when we were together last, basically the Sixth Amendment right to counsel is case specific, and the fact that there may have been a violation of that right as to the assault case does not require statements be excluded in this case.

Getting past those preliminary issues, the allegation is that the statements to Detective Norcross were voluntary--were involuntary, rather.  The standard is whether coercive police activity played a significant role in inducing those statements.

The case law sets out a number of factors I need to address.  First of all, custodial status.  Mr. Lucero was not in custody, and he must have known it.  He was riding around in a car.  He was not--had not been Mirandized.  He had--did not have the opportunity to confer with counsel or anyone else during the conversation nor did he request it.

Some of his statements were spontaneous and some, the majority, were in response to questions from the deputy.  There was no- -there were no overt or implied threats or promises or even intimidation.

The detective, who Mr. Lucero knew--and, in fact, had on occasion sought out--was in plain clothes, unmarked vehicle, not brandishing a weapon.

As I've indicated, the questioning occurred in a car driving around somewhere.  The testimony is [sic] it [sic] was done in a conversational way and was not lengthy.  There is no indication that Mr. Lucero was suffering from any mental or physical infirmities.

From reading the transcript, his answers made sense; his conversation was rational.  That's as much as I could glean from that.

He had had significant law enforcement contacts.  He had had significant contacts with the criminal justice system, including this deputy--detective rather.

He had been previously Mirandized in other cases.  In at least one case he had agreed to talk after being Mirandized, and in one he chose not to, indicating that he understood at least what--how things worked.

The nature of the statement itself, it is for the most part an attempt at exculpation.

Considering all of those factors, it is clear to me, abundantly clear to me, that the statement was voluntary for constitutional purposes.

The fact that Detective Norcross sought to use his relationship with Mr. Lucero is--well, it's both true and irrelevant.  I am not aware of any constitutional prohibition to that occurring.

So the motion to suppress those statements is denied.

The next motion is number 41 which seeks to suppress statements made during the interview or interrogation of March 28, 1995.  The motion makes some allegations that I want to address before I address the factors I need to.

First of all, that Detective Norcross was used to gain the defendant's trust and put him at ease.  It may be true, but it's certainly, constitutionally, irrelevant.  There is nothing wrong with that.

Secondly, that they knew--law enforcement knew Mr. Lucero was represented by counsel.  As I have already indicated, that is both true and irrelevant to this case.

It is also alleged that an accusatory and adversarial tone was used.  That is true to some extent.  The defense alleged that Mr. Lucero felt intimidated, felt he was a suspect, felt he wasn't free to leave, that the officers had the 41.1 order and that in general these statements were not voluntary due to the atmosphere and the defendant's understanding that he was not free to leave.

Since custodial status is a factor, I think I need to address in some greater length whether Mr. Lucero was in custody; in other words, whether a reasonable person in his position would consider himself deprived of his freedom of action in some significant way.

The short answer is no, but I have to give the long answer and address the following factors.  First of all, the time.  This occurred in the morning and into the early afternoon.  It occurred in the Grand Junction Police Department conference room.  The purpose of the encounter, clearly from law enforcement's point of view, was to get information from Mr. Lucero.

I don't think--I like to think they are not in the business of idle chat.  Persons present were Mr. Lucero, Detective Barley, Detective Cowgill, Detective Norcross, at least Detective Norcross was there most of the time.

The words spoken are indicated as well as we can know on Exhibit 8 and in the testimony.  There are some words that I think are particularly significant for determining custodial status.

First of all, that Mr. Lucero was told--before he got into the car and also at the police station- -that he was not under arrest, did not have to stay or come down to the police department.

Second, that he was told- -before getting to the police department- -that they wanted to discuss these homicides with him.  He wasn't tricked into thinking they wanted to talk about something else.

And third, that he was Mirandized and indicated that he understood the advisement, even though ultimately I will be concluding that was unnecessary.  The officers' tone and demeanor were, at first at least, conversational.  Later Detective Barley became accusatory, without apparent effect on Mr. Lucero however.

The interrogation length was from abut 9:30 in the morning, or a little after, until the rule 41.1 order was served, which was at 12:08, so we are talking about two-and-a-half hours maximum.  The only restraint on Mr. Lucero's movement during the entire time was a seat belt in the car.

I don't recall any testimony that Mr. Lucero asked questions or that he was directed to do anything.

From all of this I conclude that he was not in custody, constitutionally speaking.  And in fact, acknowledged as much.  Detective Barley went so far as to ask him if he believed he wasn't under arrest, and he said yes.

And I think it's important to remember in this respect, that even though the officers had the 41.1. order, Mr. Lucero did not know it so it could not have affected his, or a reasonable person in his position, view of his custodial status.

Addressing the other factors on voluntaryness [sic], as I said, he was not in custody; he knew it.  He was Mirandized; he understood it.  He waived those rights.  Although he did not have a chance to talk with counsel, he didn't ask.  His statement was in fact largely the product of interrogation; not much of it was spontaneous.

He was not given any promises or threats.  He seemed from his answers mentally fine.

And, finally, it's clear from reading his comments, that he was trying to exculpate himself, which I think further supports my conclusion, and my conclusion is that these statements were entirely voluntary, and so that Motion 41 is denied.

Mar. 1, 1996, Mot. Hr'g Tr. at 21-28 (95CR258 CD 96.03.01000).

Upon direct appeal, the CCA set forth a detailed analysis of Petitioner's first claim as follows:

Defendant first contends that the trial court committed reversible error by admitting his statements to police officers.  He urges that the statements were involuntary and obtained in violation of the Crim. P. 41.1 order.  We disagree.

One is "in custody" not only when he or she has been subjected to the constraints associated with a formal arrest, but also when a police interrogation is conducted under circumstances where the person interrogated has been deprived in a significant way of freedom of action.  *People v. Trujillo*, 938 P.2d 117 (Colo. 1997).

Factors to be considered in determining whether a reasonable person in a suspect's position would have believed that he or she was free to leave include: (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and atmosphere of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.  *People v. Trujillo*, *supra*.

When a defendant challenges a confession or inculpatory statement, the prosecution must establish voluntariness by a preponderance of the evidence.  A confession or inculpatory statement is involuntary if coercive governmental conduct played a significant role in its inducement.  *People v. Gennings*, 808 P.2d 839 (Colo. 1991).

The voluntariness of a confession or inculpatory statement must be determined by a consideration of the totality of circumstances under which the statement was made.  Relevant factors include: (1) whether the defendant was in custody or was free to leave and was aware of his situation; (2) whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived *Miranda* rights; (3) whether the defendant had the opportunity to confer with counsel or anyone else before the interrogation; (4) whether the challenged statement was made during the course of an interrogation or instead was volunteered; (5) whether any overt or implied threat or promise was directed to the defendant; (6) the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; (7) and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as the defendant's educational

background, employment status, and previous experience with law enforcement and the criminal justice system. *People v. Gennings, supra.*

In ruling on a motion to suppress a custodial statement, a trial court must engage in both fact-finding, which involves an inquiry into the factual circumstances of the case, and a legal determination, which involves the application of the controlling legal standard to the facts established by the evidence. *People v. Valdez*, 969 P.2d 208 (Colo. 1998).

If supported by competent evidence in the record, a trial court's findings of fact are entitled to deference and will not be overturned. However, an ultimate conclusion of constitutional law that is inconsistent with or unsupported by evidentiary findings is subject to correction by ana reviewing court. When the controlling facts are undisputed, their legal effect is a question of law subject to *de novo* review. *People v. Valdez, supra.*

A.

Here, the day after the victims were found, defendant was contacted by a narcotics detective who had been using him as an informant. The detective interviewed defendant while they drove around for approximately 50 minutes in an unmarked police car. Most of the conversation focused on information the detective sought from defendant in his capacity as an informant. However, toward the end of the conversation the detective told defendant that the male victim had been found dead and asked defendant when he had last seen that victim. He also asked defendant if he knew anyone who might have wanted to "get" that victim.

In a pretrial motion, defendant argued that his statements during this conversation should have been suppressed because they were involuntary. He admitted, however, that he had not been in custody during this interview.

In denying the motion and determining that defendant's statements had been made voluntarily, the court noted that there had been no overt or implied threats, promises, or intimidation; that the detective had been wearing plain clothes and driving an unmarked car, and had not been brandishing a weapon; and that the interview had been conducted in a conversational tone.

While the court found that the detective used his relationship with defendant to elicit information, it found that fact irrelevant. The court also concluded that defendant had not been in custody.

Relying on *People v. Fish*, 660 P.2d 505 (Colo. 1983), defendant contends that because the detective led him to believe he was only being interviewed in his

capacity as an informant, his statements were the product of "direct or implied promises."

In *People v. Fish*, *supra*, a defendant-informant's statements to police were suppressed after he testified that he had only agreed to talk to the police because he thought he was "working undercover" and that he was not suspected of any crime. He had also asked if he needed counsel and had been assured by the interrogating officers that he did not. The trial court found that, under the circumstances, defendant's statement had not been voluntary.

In our view, the facts in *Fish* are distinguishable from those at issue here. Here, unlike in *Fish*, no affirmative misrepresentations were made either as to defendant's right to, or need for, an attorney or otherwise.

Accordingly, we conclude that the trial court did not err in denying defendant's motion to suppress the statements he made during this initial interview. Because such statements were not obtained in violation of defendant's *Miranda* rights, we also reject his argument that his later statements were tainted by that initial interview.

## B.

The day after the initial interview, defendant was again asked by the same narcotics detective to discuss the homicides. Although defendant was asked to go to the police station for the interview, he was repeatedly told that he was not under arrest and that he could leave the interview at any time. The interrogation continued for approximately two and one-half hours before the detectives served on defendant a previously obtained Crim. P. 41.1 order for non-testimonial evidence.

In his suppression motion, defendant argued that his statements were involuntary because he had felt he was a suspect and had been intimidated. The defendant also argued that the statements should have been suppressed because the police had exceeded the scope of the Crim. P. 41.1 order.

The trial court rejected defendant's arguments and concluded that he had not been in custody and that his statements had been voluntary. The court also concluded that the taking of the statements had not been in violation of the Crim. P. 41.1 order.

The court found that defendant had been told both before and after arriving at the police station that he was not under arrest and also found that his movement had not been restrained. In addition, the court emphasized that defendant had received a *Miranda* advisement and had voluntarily signed a written waiver.

We conclude that even if defendant was in custody at the time of this interrogation, his statements were nevertheless voluntary. Defendant received the *Miranda* advisement, appeared to understand his rights, and then waived them; and he did not request an attorney.

We also reject defendant's contention that his statements should have been suppressed as having been obtained in violation of the Crim. P. 41.1 order.

An order authorizing non-testimonial identification must specify the non-testimonial procedures to be conducted. By definition, such an order does not authorize the acquisition of testimonial communications protected by the privilege against self-incrimination.

The factors to be considered in determining whether the police exceeded the scope of a Crim. P. 41.1 order include: the subjective intent of the police in executing the order; an objective assessment of their actions in light of the facts and circumstances known to them; the identity of the party who initiated the conversation that led to a suspect's inculpatory statement or confession; and the physical environment of the suspect when such statements were made. *People v. Harris*, 762 P.2d 651 (Colo. 1988), *cert. denied*, 488 U.S. 985, 109 S. Ct. 541, 102 L. Ed.2d 572 (1988).

In *People v. Harris*, *supra*, a defendant's statements made during the execution of a non-testimonial order were suppressed after a police detective admitted that the order was a "ruse" for putting the defendant in a position where he might talk. The detective further admitted that questioning the defendant while transporting him for tests was "part of the plan" for obtaining information from him.

Here, unlike in Harris, the detectives did not use the order as a means of taking defendant into custody and obtaining statements from him. The interview could have taken place without the police ever having obtained the order.

Further, we are not persuaded by defendant's argument that the police had a duty to inform him of the order or to serve it on him before interrogating him. As the supreme court pointed out in *People v. Pease*, 934 P.2d 1374, 1378 (Colo. 1997): "Nothing in the Constitution or *Miranda* requires police to tell a suspect all the facts and circumstances which might affect the suspect's decision whether to waive his rights."

Here, as in *Pease*, the record does not indicate that affirmative misrepresentation or trickery were used by the police to break down defendant's will. The *Pease* court found that the police's failure to tell the defendant that they had obtained an arrest warrant did not affect the voluntariness of defendant's

waiver decision.  The court concluded that it was immaterial that the defendant would not have waived his rights had he known of the arrest warrant.

That conclusion applies equally here.  The police's not having informed defendant of, or served him with, the Crim. P. 41.1 order prior to interrogation is simply immaterial to the issue of voluntariness.

Accordingly, we agree with the trial court's conclusion that defendant's statements were voluntary and did not have to be suppressed.

*Lucero*, No. 96CA2264 at 4-12.

To be admissible under the Due Process Clause of the Fourteenth Amendment, a defendant's statements to police must have been "made freely, voluntarily and without compulsion or inducement of any sort."  *Nickel v. Hannigan,* 97 F.3d 403, 410 (10th Cir. 1996) (citing *Haynes v. State of Wash.,* 373 U.S. 503, 513 (1963)).  "[T]o conclude that a confession is involuntary under the Due Process Clause of the Fourteenth Amendment, [the court] must find that it was the result of 'coercive police activity.' "  *Id.* (quoting *Colorado v. Connelly,* 479 U.S. 157, 167 (1986)).  Voluntariness is determined in view of the totality of the circumstances. *Nickel,* 97 F.3d at 410 (citing *Haynes,* 373 U.S. at 513)).  The Court must determine whether (1) the waiver was "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Again, the "totality of the circumstances" must reveal a voluntary waiver. *Id.* (citing *Fare v. Michael C.,* 442 U.S. 707, 725 (1979)) (internal quotation marks omitted).

Reviewing the voluntariness of Petitioner's statements as a mixed question of fact and law, in a plenary fashion, *Miller v. Fenton*, 474 U.S. 104, 112 (1985), the Court agrees with the CCA that his statements were voluntary for the following reasons.

First, contrary to Petitioner's claim nothing in the trial record leads the Court to find that Petitioner was providing information at either of the two interviews in exchange for promises. *See Arizona v. Fulminante*, 499 U.S. 279 (1991) (involuntary confession was found when promise was made by informant/prisoner to protect defendant against credible threats by other inmates if defendant made full confession); *see also United States v. McCullah,* 76 F.3d 1087 (10th Cir. 1996) (involuntary confession made to informant/prisoner like in *Fulminante* but fabricated threats were told to defendant).  Here, Petitioner fails to state what promise was made to him in exchange for the information other than he was a paid informant.  Even if Petitioner did believe he was participating in either of the interviews as an informant and in exchange for any promises, Petitioner, as determined during the motions hearing, was well acquainted with the criminal justice system, including fifteen contacts with the Grand Junction Police Department, in several of which he was a suspect.  *Id.* at 249 (96-02-210000).  Petitioner was well aware of his rights and the consequences of speaking freely with police officers.  Furthermore, both Detective Norcross and Detective Cowgill testified during the motions hearing that Petitioner was aware he was being taken to the police station to discuss the homicides.  Feb. 21-20, 1996, Mot. Hr'g Tr. at 266 (96-02-210000) and 211 (96-02-200000).

Second, the Court finds that Petitioner's claims regarding his belief that he was under arrest are belied by the motions hearing transcript.  Two of the three detectives who went to Petitioner's house and asked him to go to the police station testified at the motions hearing that none of the three were in uniforms and at the most only three unmarked police cars were at Petitioner's house.  Mot. Hr'g Tr. at 267 (96-02-210000) and 209 (96-02-200000).  The two detectives also testified that during the two and one-half meeting with Petitioner only three individuals besides Petitioner were in the room.  *Id.* at 268 and 212.  With respect to the *Miranda*

warning, testimony was provided during the hearings motion and considered by the trial court that Petitioner was read his *Miranda* rights, preceding questioning, and Petitioner signed a waiver form. *Id.* at 268 and 213. Furthermore, testimony was given that in a separate criminal case involving Petitioner, and prior to the meeting with the three detectives in this case, Petitioner had received a *Miranda* warning and was familiar with the process. *Id.* at 265-66.

Finally, Petitioner's claims regarding the serving of the Rule 41.1 order lack merit. It is clear from the transcript of the motions hearing that Petitioner was not brought into custody pursuant to the warrant and that he did not know about the warrant at the time he was subjected to the questioning at the police station. *Id.* at 271-277 (96.02.210000). There is no suggestion from a review of the transcript of the motions hearing that the Rule 41.1 order was used, as suggested by Petitioner, in an effort to make Petitioner talk.

Therefore, nothing in the record indicates that Petitioner did not give his statements freely and without intimidation, coercion, or deception. Considering the totality of the circumstances, Petitioner knew his rights and decided to abandon them. The Court agrees with the CCA that Petitioner's statements made during both of the interviews were voluntarily given and, thus, concludes that the trial court did not err in admitting his statements and the evidence derived therefrom. The CCA's and the trial court's findings are not so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. *Richter*, 131 S. Ct. at 786-87.

Accordingly, the CCA decision set forth above did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and did not result in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Claim One lacks merit and will be dismissed.

**2.  Claim Two**

In his second claim, Petitioner asserts that the trial court violated his Sixth Amendment rights by allowing inadmissible hearsay statements.  Petitioner contends that the statements made by one of the victims (Ms. Miller) were inadmissible hearsay because the statements did not fall within the state of mind exception to Colo. R. Evid. 803(3)[3] or within the residual exception to Colo. R. Evid. 804(b)(5).[4]  Pet. at 6.  Petitioner further contends that admission of these statements violated the Colorado Rules of Evidence, the Sixth Amendment of the U.S. Constitution, and Article II, § 16 of the Colorado Constitution and was damaging to his case in light of the otherwise weak circumstantial evidence.  Pet. at 6.

---

[3]  Colo. R. Evid. 803(3) Hearsay Exceptions; Availability of Declarant Immaterial, states as follows:

> (3) Then Existing Mental, Emotional, or Physical Condition.  A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

[4]  The contents of Rule 804(b)(5) were transferred to Rule 807.  The move was done to facilitate additions to Rules 803 and 804.  No change in meaning is intended.  Rule 807 reads as follows:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.  However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

In his Traverse, Petitioner also argues that the admission of the hearsay testimony violated *People v. Madison*, 638 P.2d 18 (Colo. 1981).  Traverse at 13-14.  Petitioner contends that the evidence surrounding the statement did not contain circumstantial guarantees of trustworthiness because (1) Ms. Miller had been drinking prior to making the statement to the police officer; (2) Ms. Miller was in good spirits and did not appear fearful during the interview; (3) the police officer conducting the interview did not record the statements and testified to the statements from recollection; and (4) Ms. Miller had motive to lie because the other victim owed Petitioner money or drugs.  Traverse at 14-15.

The trial court, in addressing the admissibility of Ms. Miller's comments under Rule 804(b)(5) found as follows:

> I next need to take a look at this evidence under Rule 804(b)(5) and the confrontation clause, and I think it is necessary to do that with a little more specificity, because we are no longer talking about just subject matter.  We are talking about specific statements and the circumstances under which they were made and their contents.

> As counsel know, Rule 804(b)(5) requires a number of things to admit evidence which would otherwise be hearsay.  It requires circumstantial guarantees of trustworthiness equivalent to that possessed by other hearsay exceptions.

> It requires that the evidence be evidence of a material fact; that it be more probative on the point than other evidence the proponent can reasonably procure; and that the admission of this evidence serves the general purposes of the Rules of Evidence, which are to secure fairness in administration, eliminate unjustified expense and delay, and to ascertain the truth and justly determine the proceedings.

> It also requires that the evidence be evidence of a material fact; that it be more probative on the point than other evidence the proponent can reasonably procure; and that the admission of this evidence serves the general purposes of the Rules of Evidence, which are to secure fairness in administration, eliminate unjustified expense and delay, and to ascertain the truth and justly determine the proceedings.

> It also requires that the evidence serve the interests of justice.

Since this is a criminal case, the confrontation clause of the U.S. Constitution and Colorado Constitution imposes some additional requirements, the first of which is not in dispute.

The declarant must be available [sic]; and to the extent we are talking about statements of Lorisha Miller, that is, unfortunately, the case.

Second, the evidence must bear indicia of reliability to ensure no material departure from the purpose of confrontation.

In evaluating that, as the court indicated in *U.S. v. Chapman*, which counsel cited for me, 11th Circuit, 1989 case, I am required to consider corroboration, the extent of the declarant's knowledge, the possibility that the statement is based on faulty recollection, and the circumstances under which it was made.

In *Idaho* [*v.*] *Wright*, which is a 1990 U.S. Supreme Court case, the [C]ourt made clear that in evaluating this evidence the court -- I can only consider circumstances surrounding the making of the statement and that render the declarant particularly worthy of belief.  In other words, if a statement is corroborated by other evidence, the U.S. Supreme Court says I am not to consider that, and so I won't.

Finally, the confrontation clause requires that the evidence be excluded unless the proponent makes an affirmative showing, presumptively, that hearsay is reliable.  And that means that the burden is on the People in this instance.

With that legal background, let me look at the specific statements.  First of all, Lorisha Miller's statement to Deputy Glade Johnson on February 24, 1995.  That statement does internally possess corroboration.  Corroboration by the injuries which Deputy Johnson observed, which other law enforcement personnel photographed, and which medical personnel observed and treated.

The statements made by Miss Miller were clearly within her knowledge. She was talking about injuries which were inflicted to her, and she was talking about the defendant who, according to her statement, was an acquaintance of some time.

I don't think there is any substantial chance that she was simply recalling events incorrectly.  She was describing events that had occurred within the last eight days according to her statement.

And I think the circumstances add to the credibility of these statements. They were made in a hospital.  They were made in the context of obtaining treatment for the injuries.  They were made to a deputy.  As, I think, Mr. Nugent

pointed out in argument, it is in fact illegal to make false statements about crimes to a deputy.  And in the process Miss Miller also filled out a domestic violence form.  I infer that to mean that she put similar information down in writing.

I'm satisfied that these statements meet the requirement of Rule 804(b)(5), and they meet the requirement imposed by the confrontation clause for admission . . . .

The next area of statements I want to address are Miss Miller's statements to Glade Johnson on the following day, February 25, 1995.  The same comments generally would apply to those.

The only differences are that she was not in the hospital when the statements were made, which arguably could detract from their reliability.  On the other hand, in her statement she directed Deputy Johnson to medical records which she said would in fact corroborate some of what she was saying, which I think argues in favor of the reliability of those statements.  And I believe these statements also satisfy 804(b)(5) and do not run afoul of the confrontation clause. . . .

Mar. 1, 1996, Mot. Hr'g Tr. at 11-15 (96.03.01000).

Not until a bench conference was held during the trial did the trial court discuss with great detail whether Ms. Miller's statements to both police officers were admissible under Rule 803(3).  Trial Tr. at 112-39 (95CR258 CD 96.09.240000).  Specifically, the trial court addressed Ms. Miller's to police officer Alderton regarding Petitioner's statement of his intent to kill her and her fear of his doing so.  *Id.*  Ultimately, the trial court made a distinction between the admissibility of Ms. Miller's statement that Petitioner stated he would kill her if she went to the police and her comment on whether she believed Petitioner would do so.  The trial court found only the intent to kill statement to be admissible under *Madson*.  *Id.* at 133-34.  The trial court further found Ms. Miller's statement that Petitioner told her he would kill her if she reported the beatings to the police was a first level hearsay by a declarant, which is a statement of the state of mind by Petitioner.  *Id.* at 132.  The trial court concluded that the statement would come in because the statement was made by the defendant.  *Id.*  The trial court further found that the

24

second level of hearsay is Ms. Miller's statement to Ms. Alderton, which was addressed and

found to be admissible at the motions hearing under Rule 804(b)(5).  *Id.* at 133.

In Petitioner's direct appeal, the CCA found:

> Defendant next contends that the trial court committed reversible error by
> admitting hearsay statements made by the woman victim.  He asserts that
> admission of such evidence was in violation of the rules of evidence and his right
> to confrontation.  We disagree.

> Two police officers were allowed to testify at trial about statements the
> woman had made to them while she was in the hospital following the earlier
> assault.  The first deputy testified that she had told him "she was afraid that
> [defendant] would hurt her further" if she left him.  Defense counsel objected, and
> the court sustained the objection.

> The court then held a bench conference to discuss the deputy's testimony,
> as well as the upcoming testimony of another deputy, in order to clarify the
> court's pre-trial ruling as to the hearsay statements.  It was anticipated that the
> second deputy would testify that the victim had been reluctant to provide
> information about her assault because defendant had "told her that he would kill
> her if she told the police."

> At a pre-trial hearing, the court ruled that the victim's statement to the first
> deputy were [sic] admissible under the residual hearsay exception in CRE
> 804(b)(5).

> During the bench conference at trial, the court referred to its pre-trial
> ruling as including the statements made to <u>both</u> of the deputies.  With regard to
> the victim's statement to the first deputy that she was afraid of defendant, the
> court found that this statement reflected the victim's state of mind.  Finally, the
> court noted that the victim's report of defendant's threat was not a prediction of
> the future and therefore did not present a problem under *People v. Madson*, 638
> P.2d 18 (Colo. 1981).

> At the outset, we note that the victim's statement that she was afraid of
> defendant does reflect a state of mind of the declarant and that defendant has not
> challenged the admission on the basis of relevancy.  *See* CRE 803(3); and *People
> v. Evans*, --- P.2d --- (Colo. App. 96CA1602, Nov. 13, 1998) (approving
> admission of statement of witness that victim had said she was afraid of
> defendant).

> Even if we assume that the evidence was not properly admissible pursuant
> to the state of mind exception in CRE 803(3), we would find no basis for reversal

of the trial court's ruling that the statements were admissible under the residual hearsay exception.

The conditions for admissibility of evidence under CRE 804(b)(5) are that: (1) the statement is supported by circumstantial guarantees of trustworthiness; (2) the statement is offered as evidence of material facts; (3) the statement is more probative on the points for which it is offered than any other evidence which could be reasonably procured; (4) the general purposes of the rules of evidence and the interests of justice are best served by the admission of the statement; and (5) the adverse party had adequate notice in advance of trial of the intention of the proponent of the statement to offer it into evidence.  CRE 804(b)(5); *People v. Fuller*, 788 P.2d 741 (Colo. 1990).

Trial courts have a considerable measure of discretion in applying this exception to the hearsay rule.  *People v. Fuller supra.*

First, we find no basis for rejecting the trial court's findings that the victim's statements possessed internal guarantees of trustworthiness.  Her account was consistent with her injuries that were observed and photographed by the deputies.  In addition, the statements were made to law enforcement officers while she was still in the hospital obtaining treatment.  She also provided written statements that were substantially similar to those she made at the hospital.

Our examination of the record convinces us that, although the trial court erred in not making specific findings as to the other elements required for admission of the statements pursuant to CRE 804(b)(5), because the statements did meet those additional requirements, such error was harmless.  *See People v. Fuller*, *supra* (trial court's failure to make specific findings as to each requirement under CRE 804(b)(5) was harmless where reviewing court could determine that each element had in fact been satisfied).

The statements here were offered to establish the material fact that defendant had a motive to kill the woman victim because she had blamed defendant for her injuries and he had thereafter been criminally charged.  Thus, the statements also went to prove the retribution element of the crime of retaliation against a victim or a witness.  The statements were more probative on the point for which they were offered than any other evidence because they specifically explained defendant's motive for retaliation.  The admission of the statements also served the interests of justice because they had guarantees of reliability, and they aided the jury in ascertaining the truth about the victim's death.  Finally, proper notice was given regarding the statements made by the victim to the first deputy, and defendant and his counsel were also made aware that the victim's statements to the second deputy were going to be offered because they were specifically discussed during the bench conference before the deputy testified.

Thus, we find no violation of defendant's confrontation rights by the admission of the deputies' testimony pursuant to the residual hearsay exception.

*Lucero*, No. 96CA2264 at 12-16.

The Confrontation Clause guarantees an accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (internal quotation marks omitted). A defendant's right to confrontation, however, is not absolute. *See Lilly v. Virginia*, 527 U.S. 116, 123-24 (1999); *Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980). At the time of Petitioner's conviction,[5] federal law recognized that a confrontational right was not abridged by the admission of hearsay evidence if the statement fell within a "firmly rooted exception" to the hearsay rule, or if the statement was otherwise attended by "particularized guarantees of trustworthiness." *See Stevens*, 465 F.3d at 1236 (citing *Roberts*, 448 U.S. at 66). Under *Roberts*, an out-of-court statement is admissible if the prosecution demonstrates both the unavailability of the declarant and that the out-of-court statement has an "indicia of reliability." *Roberts*, 448 U.S. at 66; *see also Lilly*, 527 U.S. at 124-25. The Supreme Court renounced the application of a "mechanical test" to determine whether a given statement had sufficient indicia of reliability or truthfulness, and the courts have

---

[5] Although in *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court tightened the analysis of Confrontation Clause claims by limiting the admissibility of testimonial hearsay, in habeas proceedings, the Court considers the state of constitutional law as it existed at the time of a petitioner's conviction. *See Stevens v. Ortiz*, 465 F.3d 1229, 1235 n. 2 (10th Cir. 2006). Moreover, it is well established that *Crawford* "does not apply . . . retroactively to cases on collateral review." *Id.* (citing *Brown v. Uphoff*, 381 F.3d 1219, 1225 (10th Cir. 2004)); *see also Whorton v. Bockting*, 549 U.S. 406, 416-17 (2007) (finding that *Crawford* did not announce a watershed rule, and therefore, could not be applied retroactively in a habeas proceeding commenced by a defendant whose conviction was already final on direct review). Petitioner's conviction became final in 2000, after the Colorado Supreme Court denied certiorari with regard to his direct appeal and Petitioner elected not to pursue a review by the U.S. Supreme Court, which was long before *Crawford* was announced in March 2004. Because *Crawford* does not apply retroactively, it is inapplicable to Petitioner's claim.

"considerable leeway in their consideration of appropriate factors." *Idaho v. Wright*, 497 U.S.

805, 822 (1990).

The CCA found the statement of fear to be admissible under Rule 803(3) but refrained

from addressing whether the statement by Petitioner of his intent to kill Ms. Miller was

admissible under Rule 803(3).   Nonetheless, when the trial court decided the Rule 803(3) issue

during the bench conference, with respect to both statements, consideration of the issue was well

in keeping not only with *Madson*, 638 P.2d at 27 (State of mind exception encompasses

statements of the declarant's present intent to engage in future conduct as proof of the subsequent

act.), but also with *United States v. Freeman*, 514 F.2d 1184, 1190 (10th Cir. 1975) (State of

mind exception under Fed. R. Evid. 803(3) "allows the admission of an extrajudicial statement,

not to prove the truth of the matter asserted, but to show a future intent of the declarant to

perform an act if the occurrence of that act is at issue.")  In other words, statements of intent are

admissible to provide a foundation for the declarant's subsequent actions.  *Id.* at 1190-91.  The

state of mind exception was held to be firmly established under Oklahoma law, *see Welch v.

Sirmons*, 451 F.3d 675, 697 (10th Cir. 2006), *abrogated on other grounds by*, *Wackerly v.

Workman*, 580 F.3d 1171, 1175 (10th Cir. 2009).  Furthermore, the Colorado state of mind

exception is identical to Oklahoma's exception in Okla. Stat. § 2803(3) and to the Fed. R. Evid.

803(3).

Even if Petitioner's statement were not admissible under Colo. R. Evid. 801(d)(2)(A)[6]

and 803(3), as suggested by the trial court, Ms. Miller's statement to the police officers were

admissible as a residual hearsay exception under the then applicable Rule 804(b)(5).  Although

the CCA does not specifically identify in the opinion that both the statement of fear and the

statement of intent to kill were admissible under Rule 804(b)(5), it is clear from the analysis that

in general Ms. Miller's statements to the police officers were to be considered admissible.  *See*

*Richter*, 131 S. Ct. at 786 (Habeas corpus is a guard against extreme malfunctions in the state

criminal justice systems, not a substitute for ordinary error correction through appeal.).  Also, as

discussed below, the trial court's failure to address each element in Rule 804(b)(5) specifically is

harmless error; the record supports a finding of adequate indicia of reliability with respect to Ms.

Miller's statements.

Assuming that a Confrontation Clause violation did occur when the trial court failed to

make specific findings as to all the elements under Rule 804(b)(5), "[the court] look[s] to

whether the prejudicial impact of constitutional error in [the] state-court criminal trial rises to the

substantial and injurious effect standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993),

and *O'Neal v. McAninch*, 513 U.S. 432 (1995).  *Welch v. Workman*, --- F.3d ---, 2011 WL

547279 at *6 (10th Cir. Feb. 16, 2011) (citing  *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (internal

quotations omitted).  Under *Brecht/McAninch*, there is a plenary review to determine if a trial

error "resulted in actual prejudice."  *See Brecht*, 507 U.S. at 637.  The Court makes this harmless

---

[6]  Rule 801. Definitions

(d)Statements Which Are Not Hearsay.  A statement is not hearsay if--

(2)Admission by Party–Opponent.  The statement is offered against a party and is (A)
the party's own statement in [  ] an individual . . . capacity . . . .

error determination based upon a review of the entire state court record.  *See Herrera v. Lemaster*, 225 F.3d 1176, 1179 (10th Cir. 2000).

The Court has reviewed the state court record and does not find that admission of the police officers' testimonies regarding Ms. Miller's statements "had substantial and injurious effect" on the jury's verdict.  *Brecht,* 507 U.S. at 637.  The CCA found that the statements were offered to establish (1) that Petitioner had a motive to kill Ms. Miller; and (2) the retribution element of the crime of retaliation against a victim or a witness.  The statements were probative because they specifically explained defendant's motive for retaliation, and they served the interests of justice because they had guarantees of reliability and aided the jury in ascertaining the truth about Ms. Miller's death.  Furthermore, proper notice of the statements was given to Petitioner and trial counsel that the statements were going to be offered.  It is clear from the trial court record that Ms. Miller's statements complied with the elements of Rule 804(b)(5).

To the extent Petitioner argues that Officers Alderton's and Johnson's testimonies were inadmissible because Ms. Miller had been drinking and was not fearful but was in good spirits at the time she made the statements, and Officer Alderton failed to record the statements in the original police report, this Court finds that the condition of Ms. Miller and the recording of the statements goes to the weight of the evidence and not the admissibility.  Furthermore, trial counsel, in cross-examining both officers, addressed Ms. Miller's drinking prior to making the statement and the failure to record Ms. Miller's statements at the time they were made.  Trial Tr. at 140-41 (96.09.240000) and at 18-29 (96.09.250000)

The jury also was strongly admonished to consider the evidence only to the extent that it had a bearing on Petitioner's motive or intent.  *Id.* at 13-14 (96.09.250000).  The jury is presumed to have followed this instruction.  *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

Finally, Petitioner's guilt was supported by other evidence.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (directing the courts to examine the overall strength of the State's case in reviewing the harmless error).  There was testimony regarding (1) Petitioner's anger over the confiscation of his cocaine by Mr. Lee, the male victim, and Ms. Miller, *id.* at 228-32, 111-113 (96.09.260000) and 93 (96.09.270000); and (2) the animosity between Petitioner and Mr. Lee, *id.* at 162-181 (96.09.300000).  Also, there was testimony by witnesses other than Ms. Miller about (1) Petitioner offering money for information about the whereabouts of  Ms. Miller prior to the murders, *id.* at 92 (96.09.270000) and 70 (96.09.250000); and (2) the injuries Ms. Miller alleges she incurred by Petitioner attacking her prior to her murder, *id.* at 53-71 (96.09.240000).  Finally, there was eyewitness testimonies that Petitioner was seen at the apartment complex where the murders took place both the night before and the morning of the day that the victims were found. *Id.* at 4-63 (96.09.270000).

Therefore, this Court finds that the CCA decision set forth above did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Claim Two lacks merit and will be dismissed.

## 3.  Claim Three

In his third claim, Petitioner contends that the trial court violated his due process rights by refusing to admit evidence of a witness's (Mr. Reizenstein's) failed polygraph test.  Specifically, Petitioner asserts the evidence of the failed polygraph test would have impeached Mr. Reizenstein's testimony that he had no involvement in the murder of the two victims in this case.  Pet. at 6.  Petitioner also asserts that the failed polygraph evidence would have presented a

basis for comparing Mr. Reizenstein's DNA with the DNA found under Ms. Miller's fingernails. Pet. at 6.

In his Traverse, Petitioner argues that (1) Mr. Reizenstein was obsessed with Ms. Miller; (2) he had an intimate sexual relationship with her just prior to her murder; (3) DNA consistent with Mr. Reizenstein's was found in the apartment where the murders took place; (4) Mr. Reizenstein had "panties" belonging to Ms. Miller and a knife and two knife sheaths in his possession after the murder; (5) several months after Petitioner was arrested and detained Ms. Miller's purse was found at a park on a busy street; (6) Mr. Reizenstein told coworkers at the post office about the "situation" and that he contemplated suicide; (7) he lived only fifty feet from the crime scene; and (8) the Colorado Bureau of Investigation destroyed a boot print in a blood puddle consistent with the size shoe that Mr. Reizenstein wore.  Traverse at 16.  Petitioner concludes that, given the strong physical evidence linking Mr. Reizenstein to the murders and that courts increasingly have abandoned per se rules against the admissibility of polygraph results, especially for impeachment, the evidence of the failed polygraph test was essential to Petitioner's defense and should have been admitted.  Traverse at 17-18.

Although Petitioner argues that Mr. Reizenstein failed the polygraph test, he does not indicate what questions Mr. Reizenstein was asked, how he responded, and how the answers to the questions related to the eight issues stated above.  Upon review of the transcript, the Court finds that four questions were discussed outside of the presence of the jury regarding the polygraph examination, including (1) if Mr. Reizenstein participated in the death of the two victims; (2) if he knew what happened to Ms. Miller's purse after it was stolen; (3) if he caused the injuries to Ms. Miller which resulted in her death; and (4) again, if he caused the injuries to Ms. Miller which resulted in her death. Trial Tr. at 176 (96.09.250000).  Trial counsel indicated

during this discussion that he wanted to question Mr. Reizenstein during cross-examination about whether he submitted to a polygraph examination and if so what problems he had in answering the first question.  *Id.* at 177.  Although the trial court did not allow trial counsel to refer to the polygraph examination during any cross-examination of Mr. Reizenstein, the court suggested that trial counsel ask Mr. Reizenstein the same questions that the polygraph examiner had asked him.  *Id.* at 176-97.

The Court further notes that during the discussion between counsel and the trial court, the prosecution stated that if the polygraph test examiner were to testify he would state that Mr. Reizenstein passed the test in all areas.  *Id.* at 183.  The Court also notes that as a result of the discussion between all counsel and the court, trial counsel, without mentioning the polygraph test, did ask Mr. Reizenstein, on cross-examination, if he participated in any way in the death of either of the victims.  *Id.* at 202.  Trial counsel also questioned Mr. Reizenstein about his relationship with Ms. Miller, the finding of his DNA at the murder scene, Ms. Miller's stolen purse, his boots, if he had Ms. Miller's panties and two knives in his possession, his statement to coworkers that he wanted to commit suicide, and how far his apartment was from where the victims were found.  *Id.* at 126-207 and 214-220.

In *United States v. Scheffer*, 523 U.S. 303 (1998), the United States Supreme Court held there is no consensus that polygraph evidence is reliable and adoption of a *per se* rule of exclusion is permissible.  The concern expressed by *Scheffer* was that unreliable and distracting evidence, such as the results of a polygraph test, would be presented to the jury.  *Id.* at 311-314. Furthermore, nothing here indicates that the exclusion undermined fundamental elements of Petitioner's defense.  *Id.* at 315-17.  Finally, as indicated above, the *per se* rule did not prevent

Petitioner from introducing any factual evidence. *Id.* The trial court did not violate Petitioner's due process rights by refusing to admit evidence of Mr. Reizenstein's polygraph test.

The CCA decision regarding Claim Three, therefore, did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Claim Three lacks merit and must be dismissed.

## 4. Claim Five

In his fifth claim, Petitioner asserts that trial counsel was ineffective in not asking for a new venire following the trial court's comments made during voir dire. Pet. at 7. Petitioner also asserts in his Traverse that the prosecution and the trial court agreed as a result of the trial court's comments it was possible for the jury pool to infer that this case was similar to the Simpson case and that the trial court did not want a similar acquittal in Petitioner's case. Traverse at 19. Petitioner further asserts that, because the jury had not been impaneled and the jury selection had just begun, trial counsel easily could have requested a new jury pool, which would have eliminated any possibility that jurors' minds were "poisoned" by the judicial comments. Traverse at 20.

In addressing this issue, the CCA found as follows:

Here, during the jury selection process, a prospective juror stated she was worried about serving on a jury in a case that involved violence against a woman. The trial court made the following comments:

Somebody has to ask this, so I will. How many of you have closely followed the O. J. Simpson trial? Looks like about a half a dozen hands.

34

How many of you thought that was a great example of the
American justice system at work?  And you noticed that I didn't
raise my hand either.  Okay.

How many of you expect this trial to be like that trial, and I mean
in the--in terms of the atmosphere and the–circus atmosphere is the
phrase I've heard just the whole way it's conducted?  Does
anybody expect this to be a similar circumstance?  Because if you
do I will disabuse you of that expectation in a hurry.

How many of you were so offended by that trial that you just think
the whole criminal justice system is a joke or a waste of time, and
including this trial?  Anybody think that?  Anybody so–so full of
cynicism?

A juror responded that the Simpson trial had left her "pretty cynical" and
that it had been "overdone."  The trial court stated that it had "no aspirations of
being a ringmaster" and it guaranteed that the trial will not "turn into the kind of
circus that [they] saw on television."

Later, defense counsel raised the issue whether the venire could have
interpreted the court's comments as criticism of the jury's verdict in the Simpson
trial.  The trial court offered to clarify to the jury that the comment was limited
solely to the atmosphere of the trial.  Defense counsel stated he would address the
issue during voir dire but ultimately chose not to do so. . . .

We reject defendant's contention that his counsel was ineffective for not
requesting a curative instruction or moving to strike the jury panel following the
trial court's remarks regarding the O. J. Simpson trial.

At the postconviction hearing, defendant's lead trial counsel testified that
his trial conduct regarding this issue was a strategic decision on his part.  The
postconviction court found that such a decision was precisely the kind of strategic
choice which *Strickland* described as "virtually unchallengeable."  *See Strickland*,
466 U.S. at 690, 104 S. Ct. at 2068.

We agree with the trial court's ruling and find no error.  *See People v.
Gladney*, 194 Colo. 68, 72, 570 P.2d 231, 234 (1977) (defense counsel, for
strategic or tactical reasons, may consider that an instruction would be more
harmful than beneficial; for example, it might tend to draw special attention to the
evidence, thus giving it greater emphasis and jury impact than it would have had
if left alone).

*Lucero*, No. 96CA2043 at 13-14 and 16-17.

It was clearly established when Petitioner was convicted that a defendant has a right to effective assistance of counsel.  *See Strickland v. Washington*, 466 U.S. 668 (1984).  To establish that counsel was ineffective, Petitioner must demonstrate both that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice to his defense.  *See id*. at 687.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id*. at 689.  There is a "strong presumption" that counsel's performance falls within the range of "reasonable professional assistance."  *Id*.  It is a petitioner's burden to overcome this presumption by showing that the alleged errors were not sound strategy under the circumstances.  *See id*.

Under the prejudice prong, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*  In assessing prejudice under *Strickland* the question is whether it is reasonably likely the result would have been different.  *Id.* at 791-92.  "The likelihood of a different result must be substantial, not just conceivable."  *Id.* (citing *Strickland*, 466 U.S. at 693.)

Furthermore, under AEDPA, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland's* standard," which is the question we would ask if the claim came to us "on direct review of a criminal conviction in a United States district court."  *Richter,* 131 S. Ct. at 785.  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Richter,* 131 S. Ct. at 788.

If Petitioner fails to satisfy either prong of the *Strickland* test, the ineffective assistance of counsel claim must be dismissed. *See id.* at 697. Also, ineffective assistance of counsel claims are mixed questions of law and fact. *See id.* at 698.

"[C]ounsel's actions during voir dire are presumed to be matters of trial strategy," which "cannot be the basis" of an ineffective assistance claim "unless counsel's decision is . . . so ill chosen that it permeates the entire trial with obvious unfairness." *Nguyen v. Reynolds*, 131 F.3d 1340, 1349 (10th Cir. 1997); *see also Hale v. Gibson*, 227 F.3d 1298, 1317-18 (10th Cir. 2000); *Fox v. Ward*, 200 F.3d 1286, 1295 (10th Cir.) *cert. denied*, 531 U.S. 938 (2000).

Petitioner has failed to establish any resulting prejudice in Claim Five. First, the one perspective juror who stated she was pretty cynical by the end of the Simpson trial also stated that the few police officers she had dealt with had always been courteous. Trial Tr. at 49 (96.09.20am0000). The juror's comments may be supportive of Petitioner in that she appears to believe the police officer in the Simpson trial acted inappropriately. Nonetheless, the perspective juror who made the statement was dismissed. Trial Tr. at 69 (96.09.20pm0000.) Second, nothing in the trial record indicates that the Simpson comments remained at issue during voir dire and provided cause for trial counsel to seek a new jury panel. Trial Tr. (96.09.160000, 96.09.170000, 96.09.170000, 96.09.180000, 96.09.190000, 96.09.20am0000, 96.09.20pm0000, and 96.09.230000).

Finally, Petitioner's basis for finding he was prejudiced by the trial court's comments is conclusory and vague. Petitioner requests this Court to find that because there was no physical or forensic evidence the trial court's comments should be fou8d to be highly prejudicial. Circumstantial evidence alone may support a criminal conviction. *Holland v. United States*, 348 U.S. 121, 140 (1954) (observing that the "[l]aw makes no "distinction between the weight and

37

value to be given to either direct or circumstantial evidence"). The Court finds sufficient circumstantial evidence, as stated above, to support a criminal conviction, including Petitioner's prior assault on Ms. Miller, with which he was charged, the animosity between Mr. Lee and Petitioner, and the eyewitness testimonies that Petitioner was seen at the apartment complex where the murders took place both the night before and the morning of the day that the victims were found.

The Court finds there is reasonable argument that counsel satisfied the *Strickland* deferential standard. *See Richter*, 131 S. Ct. at 788. The CCA decision regarding Claim Five did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Claim Five, therefore, lacks merit and must be dismissed.

**5. Claim Seven**

Petitioner next claims trial counsel failed to present exculpatory evidence regarding a witness who claimed he saw one of the murder victims two days after the murders occurred. Pet. at 8. Petitioner also repeats this claim in his Traverse, but he does not assert in either the Petition or the Traverse what the proffered testimony of the witness would have been and how the testimony would have affected the outcome of the trial.

The CCA found that Petitioner raised numerous instances as bases for trial counsel's ineffective assistance, including failure to call certain witnesses and investigate certain evidence, but the claims were presented in summary fashion and constituted conclusory allegations. *Lucero*, No. 96CA2043 at 18. The CCA also determined that Petitioner was represented by a

38

two-person team of highly experienced defense attorneys and that the record contains no indication of any deficient assistance of a nature warranting reversal. *Id.* at 19.

"Generally, the decision whether to call a witness rests within the sound discretion of trial counsel." *Jackson v. Shanks*, 143 F.3d 1313, 1320 (10th Cir.), *cert. denied*, 525 U.S. 950 (1998). If a potential witness does not testify a petitioner should explain why or give some demonstration of the content of the testimony the witness would have given if called at trial. *Lawrence v. Armontrout*, 900 F.2d 127, 130 (8th Cir. 1990). Here, Petitioner does not explain with any precision what the witness's testimony would have been beyond the statements that the witness allegedly made to the defense investigator. Furthermore, during the Rule 35(c) evidentiary hearing regarding Petitioner's ineffective assistance claim, trial counsel testified that after the defense investigator had talked with the potential witness, he also talked with the individual but found him to be vague and unable to state facts that supported his ideas. Apr. 24, 2006 Rule 35(c) Hr'g at 103-04 (06.04.240000).

The Court finds there is reasonable argument that counsel satisfied the *Strickland* deferential standard. *See Richter*, 131 S. Ct. at 788. The CCA decision regarding Claim Seven did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Claim Seven, therefore, lacks merit and must be dismissed.

## 6.  Claim Eight

Although it is not clear that Petitioner intended to include an ineffective assistance of counsel claim in Claim Eight, and only was supporting his newly discovered evidence claim in

mentioning trial counsel's lack of diligence, the Court will address the two claims as described below. First, in his amended opening brief on appeal of the Rule 35(c) postconviction motion, Pre-Answer Resp. App. I (# 10-9) at 40, and in his Traverse at 24-25, Petitioner specifically asserts that trial counsel was ineffective in failing to investigate and cross examine Ms. Dunn regarding the stature of her brother.  Second, in his Traverse, Petitioner appears to claim that trial counsel was ineffective because he failed to impeach Mr. Roderick's testimony, which Petitioner appears to support with the recanting testimony Mr. Roderick gave at the Rule 35(c) hearing. Traverse at 25-26.

### A.  Stature Testimony

In addressing the stature testimony, the CCA found as follows:

> Defendant contends his trial counsel were ineffective for not investigating potentially exculpatory evidence regarding the testimony of a witness.  Again, we disagree.

> A crime scene investigator testified at trial that based on the unusual blood patterns at the scene of the crime, the killer attacked from low on the ground.  He hypothesized that the killer might have had wrestling experience.  A witness at trial, one of defendant's friends, testified that defendant had been a high school wrestler and she had seen him overpower her brother, who was much larger than defendant.

> At the postconviction hearing, defendant introduced evidence that the witness's brother was not as big as she had testified and argued that his trial counsel failed to investigate this issue at trial.  His trial counsel testified that he did not challenge the witness's testimony because he did not want to emphasize it and wanted to avoid highlighting defendant's wrestling experience any further. At the postconviction hearing defendant admitted to having had wrestling experience.  The trial court found that counsel's conduct amounted to a proper strategic decision and there was no reasonable possibility of a different result in light of the evidence that defendant was armed with a knife and his victims were unarmed.  We agree with the trial court's conclusion and find no error.  *See People v. Isham*, 923 P.2d 190 (Colo. App. 1995).

*Lucero*, No. 96CA2043 at 17-18.

The Court has reviewed with great detail both Lisa Dunn's trial testimony and Mr. Payne's and Ms. Hatcher's Rule 35(c) evidentiary hearing testimony regarding the stature of one of Ms. Dunn's brother. Ms. Dunn's testimony was short. She stated Petitioner told her he was a wrestler in high school, he had wrestled her brother, who she claimed was six feet three inches and weighs 190 pounds (Ms. Dunn does not clarify when her brother was this height and weight), and he was able to take her brother down. Trial Tr. at 7-8 (96.09.260000). At the evidentiary hearing, Mr. Payne, one of Ms. Dunn's brother, testified that he had wrestled Petitioner, but he was only five foot eleven inches and weighed about 143-150 pounds at the time. Rule 35(c) Evid. Hr'g Tr. at 9 (CD 95CR258 06.04.240000). Mr. Payne also testified that he has one brother that knows Petitioner, but he is less than five foot eleven, and he had not seen his brother wrestle Petitioner. *Id.* at 10. On cross examination, Mr. Payne conceded he did not know what he weighed when he wrestled Petitioner, and at the time of the Rule 35(c) hearing, fifteen years later, he weighed 280 pounds. *Id.* at 11-12. Ms. Hatcher testified that the Payne brothers were about five foot eight inches and 140 pounds at the time the wrestling with Petitioner occurred, but she conceded she was not good with weight. *Id* at 68-69. Also, at the Rule 35(c) evidentiary hearing, Petitioner testified he was a wrestler and at the time he "horse-played" with the Payne brothers they were about five feet eight inches and weighed 140-145 pounds, while he was about five foot two and weighed 127 pounds. *Id.* at 73 and 78-79.

As stated above, (1) trial counsel has the discretion to call a witness, *Jackson*, 143 F.3d at 1320; (2) there is a strong presumption that counsel's performance falls within the range of reasonable professional assistance, *Strickland* at 689; and (3) it is the petitioner's burden to overcome this presumption by showing that the alleged errors were not sound strategy, *id.*

Even if trial counsel was wrong in not cross-examining Ms. Dunn or further investigating the stature of her brother, the failure to do so does not demonstrate counsel's performance fell below an objective standard of reasonableness or that counsel's deficient performance resulted in prejudice to his defense.  First, trial counsel testified at the evidentiary hearing that he did not question Ms. Dunn extensively because he did not want to highlight her testimony and focus the jury's attention on the direct examination.  Rule 35(c) Hr'g Tr. at 107-08 (06.04.240000).  Second, nothing in Mr. Payne's or Ms. Hatcher's testimony meets the burden Petitioner has to overcome and demonstrate that trial counsel's decision not to cross-examine Ms. Dunn was not sound strategy.  Mr. Payne confirms Petitioner was a wrestler and he does not deny he wrestled with him or that Petitioner was able to take him down when he did wrestle with him.  Furthermore, Mr. Payne concedes he is not sure what he weighed at the time he wrestled with Petitioner.  Although Ms. Hatcher testifies that Petitioner was about 140 pounds at the time he wrestled one of the Payne brothers, she concedes she is not good at determining weight.  Moreover, Petitioner testified that he was at least five inches shorter than the Payne brothers at the time he "horse-played" with them.

The Court concludes that because of Mr. Payne's inconsistent statements about his weight, along with the lack of other testimony by any other individual to state with any certainty what the stature of Ms. Dunn's brother was at the time he wrestled with Petitioner, trial counsel's decision not to draw attention to Ms. Dunn's short testimony was a proper strategic decision.

The Court finds there is reasonable argument that counsel satisfied the *Strickland* deferential standard.  *See Richter*, 131 S. Ct. at 788.  The CCA decision regarding the stature claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and

did not result in a decision that was based on an unreasonable determination of the facts in light

of the evidence presented in the state court proceeding.  Petitioner's stature claim lacks merit and

will be dismissed.

### B.  Mr. Roderick's Testimony

In addressing Petitioner's multiple ineffective assistance claims, the CCA found as

follows:

> Defendant raises numerous other instances as bases for his claim of
> ineffective assistance of counsel, including counsel's failure to adequately cross
> examine witnesses, failure to investigate certain evidence, failure to call certain
> witnesses, and failure to present certain evidence.  We are not persuaded.
>
> These remaining claims are presented in a summary fashion and constitute
> conclusory allegations.  The record belies defendant's claim that he received
> ineffective assistance of counsel.  As the trial court noted, he was represented by a
> two-person team of highly experienced defense attorneys, and we conclude the
> record contains no indication of any deficient assistance of a nature warranting
> reversal.  *See Davis v. People*, 871 P.2d 769 (Colo. 1994).
>
> Accordingly, we perceive no error in the trial court's determination that
> defendant failed to establish the requisite prejudice to support his ineffective
> assistance claim.

*Lucero*, No. 96CA2043 at 18-19.

As a result of the Rule 35(c) evidentiary hearing, the court found that trial counsel was

not ineffective in his cross-examination of Mr. Roderick.  Trial Court Record, Vol. XIII at 1861.

Specifically, the court determined that trial counsel examined Mr. Roderick at great length about

his self-interest in testifying and his criminal history and that Petitioner did not suggest what

other questions trial counsel should have asked.  *Id.*  The court further noted that Mr. Roderick

was uncertain about whether Petitioner had told him Ms. Miller had scratched him on the face or

somewhere else, and, in any event, a photograph of Petitioner's face taken shortly after his arrest

and admitted as evidence allowed the jury to determine whether Petitioner's face revealed any scratches. *Id.*

In the amended opening brief on appeal of his Rule 35(c) postconviction motion, Petitioner states that trial counsel failed to cross examine Mr. Roderick about the absence of DNA under Ms. Miller's fingernails and the absence of scratches on Petitioner's face despite Mr. Roderick's testimony that Petitioner had confessed Ms. Miller scratched him during the incident. Pre-Answer Resp. App. I at 41. Without a more precise statement as to what questions trial counsel should have asked regarding the lack of Petitioner's DNA under Ms. Miller's fingernails or the existence of any scratches on his face, Petitioner failed to present an ineffective assistance claim with respect to Mr. Roderick's cross-examination in his Rule 35(c) appeal. *See United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (rejecting ineffective assistance of counsel claims and finding the court is not required to fashion arguments where allegations are conclusory).

The Court finds there is reasonable argument that counsel satisfied the *Strickland* deferential standard. *See Richter*, 131 S. Ct. at 788. The CCA decision regarding Mr. Roderick's cross-examination claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. This claim lacks merit and will be dismissed.

## CONCLUSION

For the foregoing reasons, the Petition for Writ of Habeas Corpus (# 2) is DENIED. The Court has *sua sponte* considered whether any of Petitioner's contentions warrant the issuance of a

Certificate of Appealability pursuant to 28 U.S.C. § 2253(a).  Having considered the standards of

*Slack v. McDaniel,* 529 U.S. 473, 484 (2000), the Court finds that Petitioner has not made a

substantial showing of the denial of a constitutional right such that reasonable jurists could

disagree as to the disposition of his petition. 28 U.S.C. § 2253(c)(2).  Accordingly, the Court also

denies a Certificate of Appealability.

DATED this 30th day of March, 2011.

BY THE COURT:

_____

Marcia S. Krieger
United States District Judge